AO 106 (Rev. 04/10) Application for a Search Warrant

# United States District Court

### for the
### Western District of New York



In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

THE PREMISES LOCATED AT 173 DECATUR STREET, CORNING, NEW YORK.

Case No. 17-MJ- 602

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property located in the Western District of New York *(identify the person or describe the property to be searched and give its location)*:

**The premises located at 173 Decatur Street, Corning, New York, as described in Attachment A, Premises to be Searched, which attachment is incorporated by reference as if fully set forth herein.**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

*See* **Attachment B, Schedule of Items to be Seized, which attachment is incorporated by reference as if fully set forth herein, all of which are fruits and evidence of a violation of Title 21, United States Code, Sections 841(a)(1), 846, 952, 960(a)(1), and 963.**

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: **Title 21, United States Code, Sections 841(a)(1), 846, 952, 960(a)(1), and 963.**

The application is based on these facts: *See* **attached affidavit.**
- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

DEA Special Agent William F. MacMillan
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  June 30, 2017

_____
*Judge's signature*

City and state:  Rochester, New York

HONORABLE JONATHAN W. FELDMAN
United States Magistrate Judge, WDNY
*Printed name and Title*

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises located at 173 Decatur Street, Corning, New York, specifically, the basement, the one bedroom first floor apartment, and attic in a two-story residence located at the corner of Decatur Street and Lane Street (excluding the second floor apartment). The residence has off-white colored siding with a gray-colored shingle roof. There is a porch on the ground level at the front of the residence with gray-colored numbers that read "173" above the stairs to the front porch, and there is a second-story porch off the front of the residence that is surrounded by a brown-colored railing.

**ATTACHMENT B**

**SCHEDULE OF ITEMS TO BE SEIZED**

The items to be seized are fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 843(a)(5), 843(a)(6), 846, 952, 960(a)(1), and 963, whether in documentary or electronic form, specifically:

a.      Quantities of controlled substances, including but not limited to methamphetamine and marijuana.

b.      Paraphernalia for the packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents, utensils, masks, safety goggles or glasses, and gloves.

c.      Cash, currency, financial instruments, securities, cashier's checks, money drafts, letters of credit, keys to safe deposit boxes, precious metals, jewelry, and other items of value, proceeds of drug transactions;

d.      Records of any bank or financial accounts, and records and documents of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking.

e.      Books, records, receipts, notes, ledgers, airline tickets, money orders, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, publications, checks, money orders, money transfer receipts, wire transfer records, records of drug transactions, drug sources, and drug customers, and other papers relating to the transportation, manufacturing, ordering, sale and distribution of controlled substances.

f.      Records of telephone calls contained in billing statements, addresses and telephone numbers in books and papers which reflect names, addresses and telephone numbers related to drug trafficking, photographs regarding drug trafficking and drug trafficking associates.

g.      Personal computers, laptop computers, mobile telephones, cellular telephones, smartphones, digital cameras, tablet computers, and other communication and computing devices.

h.      Electronic and digital media, including compact discs, computer hard drives, thumb drives, and flash drives.   Any manual and/or forensic search of electronic and/or digital media seized pursuant to this search warrant will require a further search warrant from the Court.

i.      Documents and records regarding the ownership, occupancy and/or possession of the searched premises, including utility bills, telephone bills, loan payment receipts, rent receipts, and lease or rental agreements.

### AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH AND SEIZURE WARRANT

State of New York )
County of Monroe ) SS:
City of Rochester )

WILLIAM F. MACMILLAN, being duly sworn, deposes and states:

#### INTRODUCTION

1.      I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801, *et seq.,* and Title 18, United States Code, Section 2516 (1).

2.      I have been employed with the DEA since June 2010. Prior to my employment with the DEA, I served for approximately four years as an officer in the United States Coast Guard where, in addition to other responsibilities, I served as a boarding officer, charged with enforcing maritime law enumerated in various sections of Title 14, 18, 19, 33, and 46, of the United States Code. I have been assigned to the DEA Rochester Resident Office since November 2010. I have solely investigated controlled substance violations since then. Over the past 10 years, I have participated in numerous drug investigations ranging from high seas drug smuggling to the illegal diversion of pharmaceutical controlled substances. Furthermore, I have been involved in the execution of numerous search warrants and searches involving suspected narcotics trafficking.

3.      During my tenure with the DEA, I have personally conducted and participated in numerous drug trafficking investigations of individuals engaged in the illegal distribution of dangerous controlled substances, including fentanyl and its analogues.  In addition, your affiant has been involved in the execution of search and seizure warrants, made arrests for violations of state and federal laws, and authored supporting affidavits.  Furthermore, your affiant has participated in the investigation of numerous drug trafficking conspiracies and cases involving the use of court-authorized interceptions of wire and electronic communications.  As a result of my training and experience, I am familiar with the manner in which controlled substances and controlled substance analogues are manufactured, smuggled, obtained, packaged, distributed, sold, and used.

4.      In connection with my work with the DEA, I have worked with federal, state, and local law enforcement officers in the Western District of New York.  These diverse personnel provide the DEA with an extensive breadth of experience and knowledge relating to illegal drug trafficking in the Western District of New York and elsewhere, in violation of Title 21, United States Code, Sections 841, 843, 846, and 952.  Based on my experience and the experience of others, I am familiar with the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions.  I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers.

5.      Based on my training and experience, I am aware that it is common practice for drug traffickers who desire to insulate themselves from detection by law enforcement to routinely utilize multiple telephones, counter surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other

conspirators. I am aware that those who distribute controlled substances often use cryptic, coded or otherwise indirect language when telephonically discussing their illegal activities. I am aware also that those who distribute controlled substances will often add adulterants or additives to their controlled substances in order to increase the bulk of their distributable product, thereby increasing profit.

6.     This affidavit is made in support of an application for a search warrant authorizing the search of the premises located at 173 Decatur Street, Corning, New York **(Target Location)**. As detailed in this affidavit, there is probable cause to believe that the **Target Location** contains evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession of controlled substances and controlled substance analogues with intent to distribute, and distribution of controlled substances and controlled substances analogues), 846 (attempt and conspiracy to possess with intent to distribute, and to distribute, controlled substances and controlled substance analogues), 952 and 960(a)(1) (importation of controlled substances and controlled substance analogues), and 963 (attempt and conspiracy to import controlled substances and controlled substances analogues).

7.     The information in this affidavit is based upon my knowledge obtained through my personal participation in this investigation, reports and information received from other law enforcement agents and agencies, and my review of recorded telephone calls from the Livingston County Jail. Because this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause that the targets of this investigation have committed and are continuing to

commit the above-referenced offenses, and that evidence, fruits, and instrumentalities of those offenses are presently located in the **Target Location.**

## DESCRIPTION OF TARGET LOCATION

8.      The **Target Location** consists of the basement, the one-bedroom first floor apartment, and attic at the two-story residence located at 173 Decatur Street, Corning, New York, which is located at the corner of Decatur Street and Lane Street.[1] The residence has off-white colored siding with a gray-colored shingle roof. There is a porch on the ground level at the front of the residence with gray-colored numbers that read "173" above the stairs to the front porch, and there is a second-story porch off the front of the residence that is surrounded by a brown-colored railing. In addition, there is a detached garage on the western side of the property along Lane Street with off-white colored siding and a white-colored door. A member of the investigative team obtained property assessment data relating to the **Target Location** from the Steuben County Assessment Information Website. This information revealed that the **Target Location** is jointly owned by Robert J. Bavisotto, ROBERT IAN THATCHER's grandfather, and Michelle Sherwood, ROBERT IAN THATCHER's mother.

## FACTS ESTABLISHING PROBABLE CAUSE

9.      The DEA is currently conducting a joint investigation with Homeland Security Investigations-Buffalo (HSI Buffalo), the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the Elmira Police Department (EPD), the New York State Police (NYSP), and the Pennsylvania State Police (PSP) into a large-scale drug manufacturing and trafficking

---

[1] Your affiant is not seeking authority to search the first floor studio apartment or the second floor apartment.

organization led by an individual named ROBERT IAN THATCHER a/k/a Ian (hereinafter, "the THATCHER Organization"). This organization is believed to be responsible for manufacturing and distributing tens of thousands of blue-colored tablets/pills containing furanyl fentanyl (N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2-carboxamide) and U-47700 (3,4-Dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methylbenzamide) in the greater Elmira, New York area. The investigative team has identified MAXIMILLIAN SAMS a/k/a Max, DWAYNE BANKS, ANTHONY PRETTYMAN, CARLITO RIOS, JR., JESUS RIVERA, TERRANCE WASHINGTON, ROBERT J. ELFORD, SCOTT FAIRBANKS, and others, as co-conspirators and/or drug distributors for the THATCHER Organization. Evidence obtained during the course of this investigation indicates that tablets manufactured and distributed by the THATCHER Organization have resulted in overdose deaths in the Elmira/Corning area.

### PRIOR SEARCH WARRANTS AND ARRESTS

10.     On May 15, 2017, the Honorable Marian W. Payson, United States Magistrate Judge, Western District of New York, issued search warrants authorizing the investigative team to search, among other locations, the premises located at 23 Somerset Drive, Elmira, New York (THATCHER's residence) (17-MJ-4052), and the premises located at 327 West Clinton Street, Elmira, New York (SAMS's residence) (17-MJ-4055), for evidence, fruits, and instrumentalities of violations of the above-described offenses. Applications and affidavits from DEA Special Agent Kevin W. Black were submitted in support of the applications for each of these search warrants. Also on May 15, 2017, the Honorable Joseph F. Saporito, Jr., United States Magistrate Judge, Middle District of Pennsylvania, issued a search warrant authorizing a search of the premises located at 604 South Lehigh Avenue, Sayre,

Pennsylvania (hereinafter, "the Sayre location"), for evidence, fruits, and instrumentalities of the above-described offenses. A copy of the application and affidavit of Special Agent Black in support of the search warrant for THATCHER's residence (17-MJ-4053) is attached hereto as Attachment C, and incorporated herein by reference as if fully set forth herein.

11.    On May 16, 2017, the investigative team executed the search warrants at THATCHER's residence, SAMS's residence, and the Sayre location.

a.    During the search of THATCHER's residence, the investigative team recovered, among other things, firearms (including a loaded AR-15 rifle and loaded shotgun), blue powder food coloring, a bulletproof vest, and several containers (including a spray can and soda cans) with false bottoms. Based on my training and experience, and my knowledge of this investigation, I know that the powder food coloring is consistent with food coloring that would be used to manufacture blue-colored pills, and that containers with false bottoms are commonly used by drug traffickers to conceal quantities of controlled substances in an effort to avoid their discovery by law enforcement authorities. In addition, the search team found a Town of Catlin, County & Town Real Property Tax Bill, from 2017 for a property located at 665 Sawdey Road, Catlin, New York (hereinafter "the Catlin location"). The tax bill listed "Thatcher Robert" at 604 South Lehigh Avenue, Sayre, Pennsylvania, as the owner of the Catlin location. The investigative team also recovered a United Parcel Service box bearing the name of Robert Bavisotto and the address of the **Target Location**.

b.    During the search of the Sayre location, the investigative team recovered, among other things, 244 blue-colored pills containing furanyl fentanyl,[2] a digital

---

[2] A laboratory analysis of a representative sample of the pills conducted by the DEA Northeast Regional Laboratory revealed that the pills contained furanyl fentanyl.

scale with residue, four firearms (including a loaded Springfield Armory, M1A .308 caliber rifle, bearing serial number 280932; a loaded Norinco SKS, 7.62X39mm caliber rifle, bearing serial number 9117047; a loaded Bushmaster made by BFI, Model XM15-E2S, .223-5.56mm caliber firearm, bearing serial number BFI630516; and an Ithaca Model 37, 12-gauge shotgun, bearing serial number 823663), and ammunition and firearm magazines.

      c.     During the search of SAMS's residence, the investigative team recovered approximately four containers (including a spray deodorant can and soup can) with false bottoms.

12.    On or about May 16, 2017, THATCHER, SAMS, BANKS and RIOS were arrested by the investigative team. Subsequently, Judge Payson issued a criminal complaint (17-MJ-4059) charging THATCHER, SAMS, BANKS and RIOS with conspiracy to possess with intent to distribute, and to distribute, quantities of furanyl fentanyl, a Schedule I controlled substance, and U-47700, a Schedule I controlled substance, in violation of Title 21, United States Code, Section 846; THATCHER and SAMS with possessing firearms in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2; and BANKS with possession with intent to distribute, and distribution, of quantities of furanyl fentanyl and U-47700 on various dates, in violation of Title 21, United States Code, Section 841(a)(1) in February, March and April 2017.

13.    On or about May 18, 2017, Judge Payson issued a search warrant authorizing the investigative team to search the Catlin location (17-MJ-4067)[3] for evidence, fruits, and instrumentalities of violations of the above-described offenses. During the search of the Catlin

---

[3] The Catlin location consists of a condemned, uninhabited house.

location, the investigative team recovered, among other things, a bag of crystalline cellulose, two unopened containers of blue powder food coloring, a bag of lactose, a sifter with residue, two funnels with residue, the top of a torn plastic bag, a label on a box with the name "Maximillian C. Sams," a box with a United States Postal Service label bearing the name "MAX SAMS," and two packing slips for contraband cans (which are cans with false compartments), bearing the name "Maximillian C. Sams." A laboratory analysis of the sifter, two funnels and the torn plastic bag conducted by the DEA Northeast Regional Laboratory revealed that each of these items tested positive for the presence of furanyl fentanyl. Based on my training and experience, and my knowledge of this investigation, I know that cellulose and lactose are excipients used in the manufacture of pills/tablets.[4]

## CONFIDENTIAL SOURCE FOUR

14.     On or about May 17, 2017, Confidential Source Four (CS-4) was arrested by the DEA. Judge Payson issued a criminal complaint charging CS-4 with conspiracy to possess with intent to distribute, and to distribute, controlled substances, in violation of Title 21, United States Code, Section 846. After CS-4's arrest, he/she was advised of his/her *Miranda* rights and agreed to speak with members of the investigative team.[5] During the

---

[4] As detailed in the attached and incorporated affidavit of Special Agent Black, an excipient, such as microcrystalline cellulose, is a substance used alongside an active ingredient of a medication to, among other things, provide bulk (also referred to as a "bulking agent" or "filler"). They are also useful in the manufacturing process because they have non-stick properties and therefore are an anti-caking agent.

[5] The information provided by CS-4 is corroborated by other evidence gathered during this investigation, including but not limited, to information from other confidential sources, physical and pole camera surveillance, evidence seized during the execution of search warrants, and records from eBay. Investigators have determined that the information provided by CS-4 is reliable and credible. CS-4 has been convicted of several criminal offenses, including Assault 3°, Resisting Arrest, Driving While Ability Impaired By the Consumption of Alcohol, Driving While Intoxicated (as both a misdemeanor and a felony), Criminal Impersonation 2°, Criminal Contempt 2°, Criminal Contempt 1° (a felony), and has two pending state charges for Criminal Possession of a Controlled Substance 3°. To date, CS-4 has entered a proffer agreement with the government, which provides, in sum and substance, that the government will not use his/her proffer statements against

subsequent interview, CS-4 stated, in sum and substance, that about six months ago he/she had accompanied DWAYNE BANKS to THATCHER's property in Catlin (which I believe to be the Catlin location). According to CS-4, the property appeared to be abandoned and was used by BANKS to house BANKS's dogs. While there, CS-4 observed BANKS go to the corner of an upstairs room, lift up the floorboards, and retrieve thousands of blue-colored pills from a concealed compartment under the floor. CS-4 observed blue pill fragments and powder all over the floor, which led CS-4 to conclude that the location had been used to manufacture pills. It should be noted that, on another occasion, CS-4 went to the Sayre location, where he/she observed a pill press and thousands of pills in the basement. CS-4 stated that the pill press was capable of making 1,000 pills per hour. CS-4 also stated that BANKS once told him/her that he (BANKS) saw THATCHER with a million dollars in cash.

15.     On May 31, 2017, the investigative team conducted a proffer interview of CS-4. CS-4 told investigators that he/she had a romantic relationship with THATCHER's girlfriend, Amber Bates, in late 2016. CS-4 told investigators that Bates once provided $2,000 in cash (United States Currency) to CS-4 "*for no reason*" and that Bates had retrieved the cash from the ceiling above a tank housing an "iguana" that THATCHER kept in his bedroom at THATCHER's residence. It should be noted that, during the search at THATCHER's residence on May 16, 2017, the investigative team observed a tank used to house a chameleon in THATCHER's bedroom. After CS-4 expressed to Bates his concern that THATCHER

---

him/her so long as he/she provides complete and truthful information. This agreement does not apply to the post-arrest statements summarized in this affidavit. The government has not yet entered into a cooperation agreement with CS-4.

would find out about Bates giving him the money, Bates said, in sum and substance, that THATCHER would not notice the money was missing.

## UNACCOUNTED FOR DRUG PROCEEDS

16.     Significantly, the investigative team did not seize any significant quantities of cash during the execution of the search warrants during this investigation (including the search warrants at THATCHER's residence, SAMS's residence, the Sayre location, and the Catlin location). The investigative team believes that, in light of the volume of drug trafficking activity engaged in by the THATCHER Organization, the relatively modest amounts of money deposited into THATCHER's and Bates's bank accounts over the last year or two,[6] and information from CS-3 and CS-4 about the substantial amount of money generated by the THATCHER Organization, there is a significant amount of drug proceeds currently unaccounted for.

## OTHER RELEVANT INFORMATION

17.     On May 16, 2017, at approximately 3:36 p.m., DEA Resident Agent in Charge (RAC) Matthew Ramarge, Border Patrol Agent Joseph Molzen and Elmira Police Department (EPD) Investigator Patrick Griffin returned to THATCHER's residence. RAC Ramarge explained to Amber Bates, who was present at the residence at that time, that a homemade AR-15 lower receiver had been seized at the Sayre location, and that investigators believed that it had been manufactured using THATCHER's 3-D printer, which the

---

[6] As detailed in the attached affidavit of Special Agent Black, there were 25 cash deposits totaling approximately $44,820 made into THATCHER's Community Bank account between February 2016 and February 2017. In addition, subpoenaed records for an account in the name of Amber Bates at Chemung Canal Trust Company show that, between January 2015 and April 2017, there were multiple cash deposits totaling approximately $129,591.28.

investigative team had observed and photographed during the initial search at THATCHER's residence. RAC Ramarge requested that Bates turn the printer over to investigators. Bates turned the 3-D printer over to RAC Ramarge as requested. When recovering the printer, RAC Ramarge observed THATCHER's grandfather, Robert Bavisotto, and THATCHER's mother, Michelle Holt, present at THATCHER's residence with Bates and others.

18.     On May 16, 2017, at approximately 8:28 p.m., ROBERT IAN THATCHER placed a telephone call from the Livingston County Jail, where he is being held pending trial, to Amber Bates, who was using the telephone number (585) 764-3994. Pursuant to policy, the Livingston County Jail recorded the telephone call.[7] During the call, THATCHER and Bates had the following exchange regarding Bates's interaction with the investigative team during the search of THATCHER's residence:

| | |
|---|---|
| THATCHER: | *Did you say nothing?* |
| BATES: | *I mean I talked to them about stuff but nothing that . . .* |
| THATCHER: | *Are you serious?* |
| BATES: | *I am sure.* |
| THATCHER: | *Listen to me. Have you hit my mom yet?* |
| BATES: | *Yeah. Of course.* |
| THATCHER: | *What about the other person?* |
| BATES: | *Um.* |
| THATCHER: | *Or have my mom hit them. Did you make sure to do that?* |
| BATES: | *Oh, yeah no. Uh, all, all good.* |

---

[7] Each telephone call made from Livingston County Jail (including each of the telephone calls summarized in this affidavit) is preceded by an automated warning to the participants in the call that the call is subject to monitoring and recording.

THATCHER:        *Are you sure? You talked to them?*

BATES:           *Yeah. He was there today with us.*

THATCHER:        *All right.*

19.     Based on my training and experience, my knowledge of this investigation, and the information set forth in this affidavit, I believe that, in this telephone call, THATCHER was asking Bates if law enforcement authorities had searched Bavisotto's residence (**Target Location**) when he asked if Bates had contacted "the other person." Bates responded that it was "all good," meaning that law enforcement authorities had not done so, and that "he" was at THATCHER's residence that day. Based on the investigative team's observation of Bavisotto at THATCHER's residence when they returned to get the 3-D printer, I believe that THATCHER and Bates were cryptically referring to Bavisotto in this conversation. It should be noted a review of Bavisotto's criminal history reveals that he has prior felony convictions for, among other things, Criminal Sale of a Controlled Substance 1° from 1982, for which he was sentenced to 20 years to life in prison, and Hindering Prosecution 2° from 2013, for which he was sentenced to four months in jail.

20.     On May 24, 2017, at approximately 1:00 p.m., DEA Special Agent Kevin Black and other investigators approached Robert Bavisotto at the **Target Location** in an effort to locate additional evidence against the THATCHER Organization (including the three missing tableting machines/pill presses). When approached by the investigative team, Bavisotto allowed them to perform a limited consent search of the basement, Bavisotto's one bedroom first floor apartment and garage area of the residence. The investigative team did not request consent to search the attic area of the **Target Location**. The investigative team did not locate or seize any relevant evidence at the **Target Location** at that time.

## INFORMATION RELATING TO GRACE BORSBERRY

21.    On May 31, 2017, at approximately 2:53 p.m., THATCHER placed a telephone call from the Livingston County Jail to Amber Bates, who was using the telephone number (585) 764-3994. During the telephone call, Bates mentioned evidence that was missed by investigators during the search of the Sayre location. Specifically, Bates said, "*They friggin did not search there because there was so much shit there that they should have, like . . .*" THATCHER interjected, apparently to prevent Bates from making a recorded statement that could incriminate them, and said, "*Shh. Chill out.*"

22.    On June 1, 2017, at approximately 8:42 p.m., THATCHER placed a telephone call from the Livingston County Jail to Amber Bates, who was using the telephone number (585) 764-3994. During the telephone call, Bates explained to THATCHER that fewer people than expected have assisted her with cleaning THATCHER's residence and the Sayre location. Bates told THATCHER that Bavisotto's girlfriend "Grace" assisted her with cleaning each location. Bates said "*he* [Bavisotto] *hasn't even been around. It has been Grace.*" Bates also said, "*Grace was wiping the walls and scrubbing the floors.*" As detailed in this affidavit, DEA Special Agent Black had conversations with Grace Borsberry, who confirmed that, at the time of this telephone call, she was Bavisotto's girlfriend and that she did in fact clean THATCHER residence and was present at the Sayre location when Bates removed the drugs and pill press. I therefore believe that Bates was referring to Borsberry in this telephone call.

23.    On June 22, 2017, at approximately 4:45 p.m., THATCHER placed a telephone call from the Livingston County Jail to Amber Bates, who was using the telephone number (585) 764-3994. During the telephone call, Bates explained to THATCHER that a

storage unit used to store their household items had been burglarized and that Bates believes that "Grace" (Borsberry) took the items.  The following is an excerpt of the call:

| BATES: | *Remember how I was on my way to the storage unit yesterday?* |
|---|---|
| THATCHER: | *To the storage. Yeah, yep.* |
| BATES: | *Walk in. Fucking no lock on the door. Fucking open up the shit. Half my fucking shit is gone. Fucking Grace.* |
| THATCHER: | *Are you kidding me?* |
| BATES: | *Nope. No fucking kidding you.* |
| THATCHER: | *Who had? She had a key?* |
| BATES: | *Yep. She fucking took a key.* |
| THATCHER: | *Yo. Yeah. You need to call on her. Na, fuck that. You need to call the police on her.* |
| BATES: | *Then she was like, oh, I have got an investigator[8] DEA coming to my house to frickin. The one that showed up at Bobbie's [Bavisotto's] house to um, tell him shit that you found. And I was like, oh, go the fuck ahead Grace you're a psychotic fucking like story teller.* |
| THATCHER: | *Did you talk to my grandpa and tell him all this yet?* |
| BATES: | *Oh yeah.* |
| THATCHER: | *What did he say?* |
| BATES: | *Fucking nothing. "Oh I didn't know she was like this." You know what else she did? Fucking stupid cunt. She fucking . . .* |
| THATCHER: | *Tell him he better pay that money or it's a problem. Tell him he better pay it now. This is all his fault. Why did she have a fucking key yo? Tell him he better pay for everything. Tell him I said that. He better pay for everything or else.* |
| BATES: | *Um, you know what else she did?* |

---

[8] DEA Investigators had not yet made contact with Grace Borsberry at the time this call between THATCHER and Bates was recorded.

THATCHER:       *What?*

BATES:          *She fucking took one of every pair of shoes.*

THATCHER:       *Yeah. I don't want to talk about it on the phone no more. Come see me Saturday.*

BATES:          *I am saying she took one of every single pair.*

THATCHER:       *I know what you said. I don't want to say anything more on the phone but you know what I want done.*

24.     During this call, Bates explained to THATCHER that their storage unit had been burglarized and that she believes that "Grace" (Borsberry) was the culprit. Bates claimed that "Grace" (Borsberry) told her that she was in contact with a DEA Investigator *"the one that showed up at Bobbie's house,"* which I believe is a reference to one of the investigators present at the consent search of the **Target Location** on May 24, 2017. Bates claimed that "Grace" (Borsberry) intended to *"tell him shit that* [Bates] *found."* As detailed herein, Borsberry subsequently told Special Agent Black that, while she was present with Bates at the Sayre location, Bates found a quantity of blue pills and powder in the heating duct in the basement and a pill press/tableting machine concealed in the dryer in the basement. Based on the information provided by Borsberry, I believe that this conversation was about Borsberry threatening to tell the DEA about the contraband and evidence that Bates retrieved from the Sayre location.

25.     On June 23, 26, and 29, 2017, Special Agent Black spoke with Grace Borsberry.[9] Borsberry stated that she had been romantically involved with Robert Bavisotto until about two weeks ago (early June 2017) and that their relationship ended when Bavisotto

---

[9] One of the reasons for initially speaking with Borsberry was to inform her about a threat of physical harm made by THATCHER during a recorded jail telephone call. Specifically, THATCHER had told Bates that Borsberry should have her jaw broken for allegedly stealing items from a storage unit.

assaulted her and injured her arm/hand. Borsberry stated that Bavisotto lives in the one bedroom apartment on the first floor of the **Target Location** (not the studio apartment), and has access to and control over the basement and attic. Borsberry also stated that Bates had accused her of stealing several items from her and that the accusations were false. During the conversations with Borsberry,[10] she made the following statements relevant to this investigation:

a.    Borsberry stated that she went with Bates to the Sayre location two or three days after the Sayre location was searched by the investigative team (which occurred on May 16, 2017). While at the Sayre location, Borsberry observed Bates retrieve 300 to 400 blue pills and powder from a heating duct in the basement and a tableting machine/pill press that was inside a dryer in the basement. Borsberry described the tableting machine/pill press as having "*a red top and silver on the bottom*" and "*a handle where you pull it down.*" Borsberry said that both items were missed by the investigative team during the search.

b.    Borsberry said that, a couple of days after THATCHER's arrest on May 16, 2017, she was present at the **Target Location** when Bates confronted Bavisotto to demand that he provide her with a portion of THATCHER's money. Bates told Bavisotto that she knew he had THATCHER's money and she could not understand why she could not have the money to buy a car because it was her money too. Bates stated that the quantity of money is $44,000, but Bavisotto did not agree or disagree with this number. Borsberry said that Bavisotto "*said that he had to talk to him* [THATCHER] *first because he didn't know if he was*

---

[10] Borsberry has a criminal record consisting of the following convictions – Possession of a Forged Instrument 2° from 2008, Prescription Forgery 2° from 2008, Falsification of Business Records from 2013, and Criminal Impersonation from 2013. Borsberry is providing the information summarized in this affidavit as a witness, and is not providing information in return for financial compensation or prosecutorial consideration. Borsberry informed Special Agent Black and Task Force Office Allen Wood that she is "bi-polar" and suffers from depression, but that these conditions do not affect her ability to recall or perceive events.

*supposed to give it to her.*" Borsberry was in the basement at the time of this conversation, and the conversation between Bates and Bavisotto took place on the first floor, but Borsberry could hear the conversation. Borsberry said that Bavisotto keeps THATCHER's drug proceeds in the attic of the **Target Location** because Bates has been known to act irresponsibly with unrestricted access to THATCHER's drug proceeds. This information is consistent with the information provided by CS-4 that Bates gave him $2,000 for no reason.

c. On a subsequent date, Borsberry observed Bavisotto give $4,500 in cash to David Cavallaro – an associate who lives at 3300 State Route 226, Tyrone, New York, which has a sign in front of the property reading "Cavallaro's Cars" – at the **Target Location** in order to buy a car for Amber Bates. At that time, Borsberry observed Bavisotto go to the attic at the **Target Location**, return with $4,500 in cash, and give it Cavallaro. Borsberry observed Bavisotto go to the attic at the **Target Location** and return with cash on at least two other subsequent occasions.

d. Borsberry also stated that Bavisotto was involved in distributing and storing quantities of marijuana at the **Target Location** from approximately December 2016 until she broke off her relationship with Bavisotto in early June 2017. Borsberry estimated that, during that time, she observed Bavisotto go to the attic at the **Target Location** and return with a package/box which smelled strongly of marijuana on between 30 and 40 occasions. According to Borsberry, Bavisotto had at least three marijuana customers (including Cavallaro and a woman in Horseheads with the first name "Lauren").

e. Borsberry also stated that Bavisotto was distributing and storing methamphetamine at the **Target Location** between approximately 2015 and the time she broke off her relationship with him in early June 2017. She identified approximately seven

17

customers to whom Bavisotto would distribute methamphetamine. Bavisotto would generally distribute the methamphetamine at the **Target Location**, but started delivering to his customers after the DEA came to the **Target Location** (which occurred on May 24, 2017). When a customer would come to the house, Bavisotto would send Borsberry and the customer to the basement. Borsberry would hear a sound like something sliding across the floor in the kitchen and Bavisotto would then come to the basement and distribute the methamphetamine to the customer in front of Borsberry.

   f. Borsberry explained that Bavisotto's nephew and his wife live on the second floor of the **Target Location,** directly below the attic area of the residence, but *"they don't know what is up there."*

   g. Borsberry also confirmed that she had, in fact, told Bates that she (Borsberry) was considering contacting law enforcement because she felt that she *"had no other options."* This statement by Borsberry is consistent with the statement by Bates during the above-described telephone call with THATCHER on June 22, 2017, that Borsberry had threatened to contact the DEA.

### ADDITIONAL JAIL TELEPHONE CALLS

  26. On June 28, 2017, at approximately 5:59 p.m., THATCHER made a telephone call from the Livingston County Jail to Amber Bates at (585) 764-3994. During the call, Bates stated that she *"just got to Grandpa's"* [which is a reference to Bavisotto] *house . . . to get some money."* Bates also stated that she does not want to *"get a job at McDonald's,"* but THATCHER's *"Grandpa* [Bavisotto] *said he can give 500 now because he said that* [Thatcher] *need[s] the rest for* [THATCHER's] *commissary and phone calls."* THATCHER responded that Bavisotto *"was going to keep putting it* [meaning money] *in slowly over time or whatever."* Bates

18

than stated, "[he] *said if it turns out that it's a thousand bucks a month that I need then it's gonna be gone.*" THATCHER responded that he did not want Bates to take the "*last money*" he has to pay the credit card bills. Bates replied that she was not seeking to use the money to pay credit card bills, but needed it to pay for a dental appointment and her daughter's birthday.

27.   On June 28, 2017, at approximately 6:20 p.m., THATCHER made a telephone call from the Livingston County Jail to Amber Bates at (585) 764-3994. During the call, Bavisotto got on the line. THATCHER addressed Bavisotto as "*Grandpa.*" Bavisotto told THATCHER that he was "*helping her out on a couple of things she came over here for,*" which meant that he was giving money to Bates. THATCHER responded that Bates needed some money for their daughter's birthday. Bavisotto told THATCHER that he did not want "*anything to run short . . . in a hurry because . . . nothing's a bottomless pit,*" which meant that Bavisotto was trying to make sure that Bates did not spend the balance of THATCHER's money. THATCHER responded that Bates should be a getting a job soon.

28.   Based on my training and experience, and my knowledge of this investigation, I believe that these two telephone calls confirm that Bavisotto is currently storing money – consisting of THATCHER's drug proceeds[11] – at the **Target Location** and that Bavisotto is rationing the money to Bates as needed. This arrangement is consistent with my training and experience. Bavisotto is a relative and close associate of THATCHER, who has a prior conviction for drug trafficking and is currently involved in drug trafficking. In my experience, criminals often rely on trusted family members and/or criminal associates to store and conceal drug proceeds, contraband and evidence for them.

---

[11] As detailed above, and in the attached affidavit of Special Agent Black, neither THATCHER nor Bates have any lawful, gainful employment.

19

## MAINTENANCE OF EVIDENCE

29.     Based on my training, my experience, my participation in numerous other narcotic investigations, my participation in this investigation, and my discussions with other experienced law enforcement agents and officers, I am aware that that:

a.     Traffickers and manufacturers of controlled substances frequently maintain, at their residence, garage, place of business or inside their vehicles, quantities of controlled substances to maintain their ongoing drug business;

b.     In addition to drugs, traffickers and manufacturers of controlled substances usually keep, at their residence, garage, place of business or inside their vehicles, paraphernalia for the packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents and utensils;

c.     Traffickers and manufacturers of controlled substances commonly maintain records, notes, and other papers relating to drug trafficking, some of which may be in code, including but not limited to sales receipts, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, records, operating manuals, computer records, publications, notes, checks, money orders, and money transfer receipts.  The aforementioned records, notes, and other papers are commonly maintained where the drug possessor/trafficker has ready access to them, such as on their person, or in their homes, garages, vehicles or businesses, or even in electronic storage devices, including, but not limited to computers, laptop computers, computer storage media (including discs, flash drives and hard drives), cellular telephones and smartphones;

d.     Traffickers and manufacturers of controlled substances commonly maintain books or papers that reflect addresses or telephone numbers for their associates or sources of supply and such items may be in code.  The above addresses and telephone numbers may also be stored in electronic storage mediums, including but not limited to cellular telephones, , laptop computers, computer storage media (including discs, flash drives and hard drives), cellular telephones and smartphones;

e.     Traffickers and manufacturers of controlled substances commonly take, or cause to be taken, photographs/videos of themselves, their associates, their property, their drugs, or their firearms, and usually maintain these photographs/videos in their residences. The above photographs/videos may also be stored in electronic storage media, including but not limited to cellular telephones, smartphones, digital cameras, tablet computer devices, home computers, and computer storage compact discs;

f.      Traffickers of controlled substances commonly maintain pagers, cellular telephones and other communication devices on their person, in their residences, in their vehicles, and in their businesses, that are utilized to further their drug trafficking activities;

g.      Traffickers of controlled substances commonly keep and utilize personal computers, cellular telephones, and smartphones, to further their drug trafficking activities (*e.g.*, to communicate with co-conspirators, customers, and suppliers; to order quantities of controlled substances from overseas suppliers; and to make payments for quantities of controlled substances purchased from overseas suppliers). The use of personal computers by drug traffickers, as well as by the general public, has increased dramatically during the past several years. During the past two years alone, I have participated in investigations where computers, cellular telephones and/or smartphones were seized and searched pursuant to court-authorized search warrants that contained digital photographs of bulk cash and the target(s) with drug associates, as well as text messages referencing drug transactions;

h.      Traffickers and manufacturers of controlled substances commonly hide contraband; proceeds of drug sales, including currency, financial instruments, precious metals, jewelry, and other items of value; and records of drug transactions, drug sources, and drug customers in secure locations within their residences, garages, vehicles, safe deposit boxes, businesses and storage areas for ready access and to conceal such items from law enforcement authorities;

i.      Traffickers and manufacturers of controlled substances must maintain, on hand, United States currency in order to maintain and finance their ongoing drug business and the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers;

j.      When traffickers and manufacturers of controlled substances amass large proceeds from the sale of drugs, they attempt to legitimize these profits by utilizing banks, and their attendant services: securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, and business fronts, among other things; and

k.      Drug traffickers and manufacturers utilize U. S. currency (cash) as the method of conducting their illegal activity.

### COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

30.     As described above and in Attachment B, this application seeks permission to search for records that might be found in the **Target Location**, in whatever form they are

found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

31.    I submit that if a computer or storage medium is found in the **Target Location**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this

22

forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

        d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

      32.     In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

        a.     The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things

described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.   Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c.   Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

33.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

34.   **WHEREFORE**, based upon all of the foregoing, your affiant submits there is probable cause to believe that the items listed in Attachment B, Schedule of Items to be Seized,

which is incorporated by reference as if fully set forth herein, are presently concealed and will be found in the **Target Location,** and that those items are evidence, records, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession of controlled substances and controlled substances analogues, with intent to distribute and distribution of controlled substances and controlled substances analogues), 846 (attempt and conspiracy to possess with intent to distribute, and to distribute, controlled substances and controlled substances analogues), 960(a)(1) (importation of controlled substances), and 963 (attempt and conspiracy to import controlled substances and controlled substances analogues).

WILLIAM F. MacMILLAN
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this 30 day of June, 2017.

HON. JONATHAN W. FELDMAN
United States Magistrate Judge
Western District of New York

25

# ATTACHMENT C

AO 106 (Rev. 04/10) Application for a Search Warrant

# United States District Court
### for the
### Western District of New York

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address.)*

THE PREMISES LOCATED AT 23 SOMERSET DRIVE, ELMIRA, NEW YORK.

Case No. 17-MJ- *4052*

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property located in the Western District of New York *(identify the person or describe the property to be searched and give its location)*:

**The premises located at 23 Somerset Drive, Elmira, New York, as described in Attachment A, Premises to be Searched, which attachment is incorporated by reference as if fully set forth herein.**

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

*See* **Attachment B, Schedule of Items to be Seized, which attachment is incorporated by reference as if fully set forth herein, all of which are fruits, evidence and instrumentalities of a violation of Title 21, United States Code, Sections 841(a)(1), 843(a)(5), 843(a)(6), 846, 952, 960(a)(1), and 963.**

The basis for search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☒ evidence of a crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: **Title 21, United States Code, Sections 841(a)(1), 843(a)(5), 843(a)(6), 846, 952, 960(a)(1), and 963.**

The application is based on these facts: *See* **attached affidavit.**
- ☒ continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

DEA Special Agent Kevin W. Black
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  May 15, 2017

*Judge's signature*

HONORABLE MARIAN W. PAYSON
United States Magistrate Judge, WDNY
*Printed name and Title*

City and state: Rochester, New York

## ATTACHMENT A

### PREMISES TO BE SEARCHED

The premises at located at 23 Somerset Drive, Elmira, New York, which is a single-family, split-level residence with white-colored siding, black shutters and a gray roof. The front entrance to the residence is a white-colored door with "23" in black numbers directly above the door. A blacktop driveway extends from the front of the residence, under a covered parking area, and leads to a white-colored shed with a white door in the backyard of the residence.

ATTACHMENT B

SCHEDULE OF ITEMS TO BE SEIZED

The items to be seized are fruits, evidence, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), 843(a)(5), 843(a)(6), 846, 952, 960(a)(1), and 963, whether in documentary or electronic form, specifically:

a.      Quantities of controlled substances, including but not limited to furanyl fentanyl and U-47700, and controlled substances analogues.

b.      Paraphernalia for the packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents, utensils, masks, safety goggles or glasses, and gloves.

c.      Equipment, chemical products and materials used to manufacture controlled substances, including but not limited to mechanical tableting machines/pill presses, parts and accessory components for mechanical tableting machines/pill presses, tablet dies, punches, excipients (including but not limited to microcrystalline cellulose), bulking agents, anti-caking agents, fillers and lubricants (including but not limited to magnesium stearate).

d.      Cash, currency, financial instruments, securities, cashier's checks, money drafts, letters of credit, keys to safe deposit boxes, precious metals, jewelry, and other items of value, proceeds of drug transactions;

e.      Records of any bank or financial accounts, and records and documents of financial transactions relating to obtaining, transferring, secreting or spending of sums of money made from engaging in narcotics trafficking.

f.      Firearms, firearms components, ammunition, firearm magazines, firearm cleaning kits, scopes, stocks, holsters, manufacturer's firearm cases, body armor, and bulletproof vests.

g.      A 3-D printing press;

h.      Books, records, receipts, notes, ledgers, airline tickets, money orders, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, publications, checks, money orders, money transfer receipts, wire transfer records, eBay and PayPal records, and Bitcoin records, records of drug transactions, drug sources, and drug customers, and other papers relating to the transportation, manufacturing, ordering, sale and distribution of controlled substances.

i.      Records of telephone calls contained in billing statements, addresses and telephone numbers in books and papers which reflect names, addresses and telephone numbers related to drug trafficking, photographs regarding drug trafficking and drug trafficking associates.

j.      Personal computers, laptop computers, mobile telephones, cellular telephones, smartphones, digital cameras, tablet computers, and other communication and computing devices.

Any manual and/or forensic search of electronic and/or cellular devices seized pursuant to this search warrant will require a further search warrant from the Court.

   k.  Electronic and digital media, including compact discs, computer hard drives, thumb drives, and flash drives. Any manual and/or forensic search of electronic and/or digital media seized pursuant to this search warrant will require a further search warrant from the Court.

   l.  Documents and records regarding the ownership, occupancy and/or possession of the searched premises, including utility bills, telephone bills, loan payment receipts, rent receipts, and lease or rental agreements.

2

*17-mg-4052*

## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEARCH AND SEIZURE WARRANTS

State of New York   )
County of Monroe   ) SS:
City of Rochester   )

KEVIN W. BLACK, being duly sworn, deposes and states:

### INTRODUCTION

1.     I am a Special Agent with the United States Department of Justice, Drug Enforcement Administration (DEA). As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801, *et seq.,* and Title 18, United States Code, Section 2516 (1).

2.     I have been employed with the DEA since November 2009. I was formerly assigned to the DEA Pittsburgh Resident Office for approximately six years. I am currently assigned to the DEA Rochester Resident Office. During my tenure with the DEA, I have personally conducted and participated in numerous drug trafficking investigations of individuals engaged in the illegal distribution of dangerous controlled substances; including fentanyl and its analogues. In addition, your affiant has been involved in the execution of search and seizure warrants, made arrests for violations of state and federal laws, and authored supporting affidavits. Furthermore, your affiant has participated in the investigation of numerous drug trafficking conspiracies and cases involving the use of court-authorized interceptions of wire and electronic communications.

3.      In connection with my work with the DEA, I have worked with federal, state, and local law enforcement officers in the Western District of Pennsylvania, Western District of New York and elsewhere.  These diverse personnel provide the DEA with an extensive breadth of experience and knowledge about illegal interstate drug trafficking.  Based on my experience and the experience of others, I am familiar with the means and methods used by persons and drug trafficking organizations to purchase, transport, store, and distribute drugs, and to hide profits generated from those transactions.  I also have experience in analyzing and interpreting drug codes and cryptic dialogue used by drug traffickers.

4.      Based on my training and experience, I am aware that it is common practice for drug traffickers and manufacturers who desire to insulate themselves from detection by law enforcement to routinely utilize multiple telephones, counter surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators.  Moreover, it is now a very common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice call and text message features, nearly simultaneously to communicate with their conspirators.  I am aware that those who distribute controlled substances often use cryptic, coded or otherwise indirect language when telephonically discussing their illegal activities.  I am aware also that those who distribute controlled substances will often add adulterants or additives to their controlled substances in order to increase the bulk of their distributable product, thereby increasing profit.  I am aware that drug traffickers often possess and use firearms to defend themselves against and deter rival drug traffickers and/or potential robbers, enforce debt collections, and in other capacities to further their drug trafficking.  Therefore, drug traffickers frequently are interested in obtaining firearms for these purposes.

2

5.    This affidavit is made in support of applications for search warrants authorizing

the searches of (1) the premises located at 23 Somerset Drive, Elmira, New York (**Target**

**Location 1**); (2) the premises located at 457 Livingston Street, Elmira, New York (**Target**

**Location 2**); (3) the premises located at 2063 Chambers Road, Beaver Dams, New York

(**Target Location 3**); and (4) the premises located at 327 West Clinton Street, Elmira, New

York (**Target Location 4**).  As detailed in this affidavit, there is probable cause to believe that

**Target Location 1**, **Target Location 2**, **Target Location 3,** and **Target Location 4** contain

evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession of

controlled substances and controlled substance analogues with intent to distribute, and

distribution of controlled substances and controlled substances analogues), 843(a)(5)

(possession of dies and other items used to make counterfeit controlled substances and

controlled substances analogues), 843(a)(6) (possession of tableting machine and other

materials used to manufacture controlled substances and controlled substance analogues), 846

(attempt and conspiracy to possess with intent to distribute, and to distribute, controlled

substances and controlled substance analogues), 952 and 960(a)(1) (importation of controlled

substances and controlled substance analogues), and 963 (attempt and conspiracy to import

controlled substances and controlled substances analogues).

6.    The information in this affidavit is based upon my knowledge obtained through

my personal participation in this investigation, and reports and information received from

other law enforcement agents and agencies.  Because this affidavit is being submitted for the

limited purpose of obtaining search warrants, I have not included each and every fact known

to me concerning this investigation.  I have set forth only the facts that I believe are necessary

to establish probable cause that the targets of this investigation have committed and are

continuing to commit the above-referenced offenses, and that evidence, fruits, and instrumentalities of those offenses are presently located in **Target Location 1, Target Location 2, Target Location 3,** and **Target Location 4.**

## DESCRIPTION OF TARGET LOCATIONS

7.      **Target Location 1** – located at 23 Somerset Drive, Elmira, New York – is a single-family, split-level residence with white-colored siding, black shutters and a gray roof. The front entrance to the residence is a white-colored door with "23" in black numbers directly above the door. A blacktop driveway extends from the front of the residence, under a covered parking area, and leads to a white-colored shed with a white door in the backyard of the residence.

8.      **Target Location 2** – located at 457 Livingston Street, Elmira, New York – is the southernmost portion of a two-story, split duplex residence with tan-colored siding and white trim with a gray roof. The front entrance to the residence is a dark brown-colored interior door with a white-colored screen door enclosed within a porch area supported by white-colored pillars. The number "457" appears in black numbers on the southernmost post closest to the road.

9.      **Target Location 3** – located at 2063 Chambers Road, Beaver Dams, New York – is a single-family, one-story residence with white-colored siding and a grey-colored roof with teal-colored or green-colored trim, located on the south side of Chambers Road. The front entrance to the residence is a white-colored interior door with a white-colored screen door. There is a small shed at the rear of the house with a star over the entrance to the shed.

10.    **Target Location 4** – located at 327 West Clinton Street, Elmira, New York –
is a two-story row house with a brick exterior that is painted light orange with white trim,
which is located at the intersection of West Clinton Street and Columbia Street in Elmira,
New York. The number "327" appears in black-colored numbers on a white-colored post on
the porch to the right of the white-colored front door. A black-colored mailbox – bearing a
white-colored label with "SAMS" handwritten in black letters – is positioned to the right of
the front door.

FACTS ESTABLISHING PROBABLE CAUSE

11.    The DEA is currently conducting a joint investigation with Homeland Security
Investigations-Buffalo (HSI Buffalo), the Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF), the Elmira Police Department (EPD), the New York State Police (NYSP),
and the Pennsylvania State Police (PSP) into a large-scale drug manufacturing and trafficking
organization led by an individual named ROBERT IAN THATCHER a/k/a Ian
(hereinafter, "the THATCHER Organization"). This organization is believed to be
responsible for manufacturing and distributing tens of thousands of tablets containing furanyl
fentanyl (N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2-carboxamide) and U-47700 (3,4-
Dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methylbenzamide) in the greater Elmira, New
York area. The investigative team has identified MAXIMILLIAN SAMS a/k/a Max,
DWAYNE BANKS, ANTHONY PRETTYMAN, CARLITO RIOS, JR., JESUS RIVERA,
and others, as co-conspirators and/or drug distributors for the THATCHER Organization.
Evidence obtained during the course of this investigation indicates that tablets manufactured

5

and distributed by the THATCHER Organization have resulted in overdose deaths in the Elmira/Corning area.[1]

12.   As detailed in this affidavit, THATCHER resides at **Target Location 1** with his significant other, Amber Bates. This investigation has revealed that THATCHER and his co-conspirators use the premises located at 604 South Lehigh Avenue in Sayre, Pennsylvania (hereinafter, "the Sayre location"), to manufacture tablets containing furanyl fentanyl and/or U-47700, using tableting machines and ingredients purchased online from eBay and other vendors (including overseas vendors), and to store drugs.[2] DWAYNE BANKS, a member of the THATCHER Organization, distributes tablets containing furanyl fentanyl and U-47700 from **Target Location 2**.   CARLITO RIOS, JR., a distributor for the THATCHER Organization who is believed to have been the intended recipient of a quarter kilogram of furanyl fentanyl from China that was seized by law enforcement authorities on March 13, 2017, resides at **Target Location 3**. MAXIMILLIAN SAMS a/k/a Max, THATCHER's partner in the operation of the THATCHER Organization, resides at **Target Location 4**.

## CONFIDENTIAL SOURCE ONE

13.   On April 7, 2016, your affiant contacted an active DEA Confidential Source (CS-1)[3] about fentanyl tablets being distributed in the Elmira/Corning area. CS-1 stated that

---

[1] On April 7, 2016, I was contacted by NYSP Investigator Matthew Lambert regarding fentanyl tablets that were being called "super pills" by local users and drug distributors. Investigator Lambert reported that these "super pills" had caused at least three overdose deaths and an additional ten overdoses in the Elmira/Corning area within a two-week period.

[2] Subpoenaed records from THATCHER's eBay account list **Target Location 1** and the Sayre location as shipping addresses.

[3] CS-1 was established as a DEA Confidential Source in August 2015. The information provided by CS-1 has been independently corroborated by investigators though physical surveillance, records analysis and other

an individual named Morgan Cloke had recently died after ingesting fentanyl tablets believed to have been distributed by ANTHONY PRETTYMAN and his cousin MAXIMILLIAN SAMS a/k/a Max. Before his death, Cloke had told CS-1 that SAMS and Ian Last Name Unknown (LNU) (believed to be THATCHER, whose middle name is IAN) had purchased a pill press machine online using Bitcoins and that they manufacture tablets containing fentanyl. Cloke told CS-1 that the press was worth between $20,000 and $30,000. CS-1 stated that PRETTYMAN's stepfather, Daryl Gardner, had revealed to CS-1 that PRETTYMAN was currently in possession of a pill press machine. CS-1 further stated that PRETTYMAN stores firearms and drug proceeds at a residence maintained by a person named Cory "Lawson" (believed to be CORY LAURENSON), but CS-1 was unaware of exactly where the residence was located.

### CO-CONSPIRATOR ANTHONY PRETTYMAN

14.     On October 25, 2016, members of the Iredell County (North Carolina) Sheriff's Office stopped a 2009 Land Rover Sport Utility Vehicle (SUV), bearing New York license plate number HFC4470 and registered to ANTHONY J. PRETTYMAN, as the vehicle traveled south on Interstate 77 near Statesville, North Carolina. PRETTYMAN was the driver and CORY LAURENSON was the sole passenger of the SUV. A probable cause search of PRETTYMAN's vehicle revealed approximately 5,330 blue pills (approximately 400 grams) labeled "V" on one side and "48/12" on the other, which were concealed in the

---

investigative means. Investigators have determined that the information provided by CS-1 is reliable and credible. CS-1 has been convicted of Criminal Sale of a Controlled Substance 3° (1994) and Conspiracy to Distribute Cocaine (2004).    CS-1 has provided information to investigators in exchange for monetary compensation.

false bottom of a paint can. PRETTYMAN and LAURENSON were arrested and taken into custody. PRETTYMAN was subsequently released on bond. Laboratory analysis of the blue pills seized from PRETTYMAN's SUV revealed that they contained furanyl fentanyl.

15.     On November 16, 2016, ANTHONY PRETTYMAN agreed to be interviewed by investigators at the Elmira Police Department (EPD). The purpose of this video-recorded interview was to assess PRETTYMAN's viability as an operational DEA Confidential Source.     During the interview, PRETTYMAN told investigators that ROBERT IAN THATCHER is the leader of an organization that distributes blue pills that are *"supposed to be Percocet."*[4] MAXIMILLIAN SAMS a/k/a Max is a drug distributor for THATCHER. PRETTYMAN stated that the pills are sometimes marked "A 12" and that he (PRETTYMAN) was selling the pills for $14 to $15 per pill prior to his arrest. PRETTYMAN also told investigators that he had never directly observed THATCHER in possession of a mechanical tableting device (pill press).     PRETTYMAN stated that THATCHER and SAMS use an *"encrypted website"* to acquire materials required for their drug distribution activities, and that THATCHER had recently acquired a three-dimensional printing press and was attempting to manufacture firearms. PRETTYMAN did not know if THATCHER had successfully manufactured a complete firearm. PRETTYMAN also told investigators that THATCHER was in possession of a .45 caliber pistol and an AK-47 rifle. PRETTYMAN also stated that THATCHER has no legitimate employment and that SAMS is a "financial genius" who specializes in laundering illicit drug proceeds.

---

[4] The active opiate ingredient in Percocet is oxycodone.

8

16.    PRETTYMAN said that THATCHER and SAMS use a location controlled by THATCHER at 604 South Lehigh Avenue in Sayre, Pennsylvania (the Sayre location), to store drugs. With regard to the pills seized from him in North Carolina on October 25, 2016, PRETTYMAN stated that he received the pills – concealed in the false bottom of a paint can – from SAMS at the Sayre location. PRETTYMAN transported the paint can containing the pills to SAMS' residence at on Clinton Street in Elmira (believed to be **Target Location 4**) where it was stored overnight. The next day, PRETTYMAN returned to SAMS' residence on Clinton Street (believed to be **Target Location 4**) to obtain the paint can containing the pills and then transported the pills to North Carolina where he was arrested. PRETTYMAN told investigators that SAMS arranged for him to meet with an unidentified black male in Charlotte, North Carolina, who intended to take possession of and distribute the pills. PRETTYMAN confirmed that THATCHER and SAMS are the "head" of the THATCHER Organization.

17.    In addition, PRETTYMAN stated that his newborn son had recently died hours after he was born after the mother (who is PRETTYMAN's girlfriend) ingested fentanyl pills that had been manufactured by THATCHER. PRETTYMAN also told investigators that at least two others have died as a result of ingesting the pills.

### THATCHER'S EBAY RECORDS

18.    In January 2017, the investigative team subpoenaed records from eBay relating to THATCHER's account. The eBay records show that, between approximately January 2014 and September 2016, THATCHER purchased numerous items commonly associated with a large-scale pill manufacturing operation. Specifically, the eBay records show that,

during this time period, THATCHER purchased, among other things, three mechanical tableting machines,[5] parts and accessory components for tableting machines, numerous tablet dies (bearing 4812V, K9, K56, M523), multiple packages containing microcrystalline cellulose[6] weighing up to 11 pounds each, and magnesium stearate.[7] The eBay records also show that THATCHER purchased several firearms components and magazines, two bulletproof vests, and a thermal imaging camera. The recipient of the above-referenced items is listed as "Robert Thatcher," and the shipping addresses for the account include **Target Location 1** and the Sayre location. Records associated with many of the vendors of these items indicate that they are based in China.

19.     Based upon my training and experience, I am aware that those who manufacture tablets containing fentanyl often obtain multiple tableting machines in order to increase their output of these illicit substances and resulting financial profit. In addition, based on a review of commonly available literature, I am aware that manufacturing tablets containing an "active" ingredient such as fentanyl or its analogues generally requires an excipient, such as microcrystalline cellulose, along with a lubricant, such as magnesium stearate, to reduce mechanical malfunctions, bind the pill together, and dilute the "active" ingredient.

---

[5] A mechanical tableting machine (or tablet press) is a mechanical device that is used to compress powder into tablets of uniform size and weight. A press can be used to manufacture tablets of a variety of materials, including illegal drugs. To form a tablet, the granulated material must be metered into a cavity formed by two punches and a die, and then the punches must be pressed together with force to fuse the material together.

[6] An excipient, such as microcrystalline cellulose, is a substance used alongside an active ingredient of a medication to, among other things, provide bulk (also referred to as a "bulking agent" or "filler"). They are also useful in the manufacturing process because they have non-stick properties and therefore are an anti-caking agent.

[7] Magnesium stearate is a chemical compound used as a lubricant in the production of pharmaceuticals and cosmetics.

20. On November 14, 2016, the Administrator of the DEA issued an order temporarily placing 3,4-Dichloro-N-[2-(dimethylamino)cyclohexyl]-N-methylbenzamide – which is U-47700 – and its isomers, esters, ethers, salts and salts of isomers, onto Schedule I of the Controlled Substances Act pursuant to the temporary scheduling provisions of that statute.

21. On November 29, 2016, the Administrator of the DEA issued an order temporarily placing N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2-carboxamide – which is furanyl fentanyl – and its isomers, esters, ethers, salts and salts of isomers, onto Schedule I of the Controlled Substances Act pursuant to the temporary scheduling provisions of that statute. Prior to November 29, 2016, furanyl fentanyl was an analogue of fentanyl, a Schedule II controlled substance.

### CONFIDENTIAL SOURCE TWO

22. On February 23, 2017, your affiant, along with Task Force Officer (TFO) Allen Wood, spoke to another confidential source (CS-2), who had been identified by members of the EPD as a lower-level drug distributor for the THATCHER Organization.[8] CS-2 identified IAN THATCHER – "IAN" is THATCHER's middle name – as the leader of a large-scale drug manufacturing organization responsible for manufacturing and distributing tens of thousands of tablets containing a "*derivative*" of fentanyl. CS-2 told investigators that the tableting machine is located somewhere in Sayre, Pennsylvania, but CS-2 did not know the

---

[8] CS-2 was established as a confidential source with EPD in February 2017. The information provided by CS-2 has been independently corroborated by investigators though physical surveillance, records analysis and other investigative means. Investigators have determined that the information provided by CS-2 is reliable and credible. CS-2 has no arrest history and has agreed to cooperate with investigators in exchange for prosecutorial consideration.

specific address. CS-2 identified DWAYNE BANKS as a distributor for the THATCHER Organization and stated that CS-2 had been receiving 200 to 400 blue tablets containing fentanyl on consignment from BANKS approximately every one to one and a half weeks at **Target Location 2**. CS-2 told investigators that BANKS generally charges CS-2 $12 per pill, but will sometimes provide slightly more pills if the pills are broken or fragmented. CS-2 stated that this occasionally happens because THATCHER does not always add the appropriate amount of binder to the pill press machine. Before cooperating, CS-2 had been distributing the pills throughout the Elmira area for $30 per pill.

## CONFIDENTIAL SOURCE THREE

23.    On April 6, 2017, investigators met with another confidential source (CS-3).[9] During the meeting, CS-3 told investigators that ROBERT IAN THATCHER had told CS-3 in approximately June 2016 that he (THATCHER) was the manufacturer and distributor of thousands of blue-colored pills containing fentanyl. CS-3 identified MAXIMILLIAN SAMS, JESUS RIVERA, MICHAEL TRANK, ANTHONY PRETTYMAN and CARLITO RIOS as distributors for the THATCHER Organization. CS-3 told investigators that THATCHER had told him/her that he had made over $750,000 in United State currency from the distribution of fentanyl pills in the Elmira, New York area. THATCHER asked CS-3 to distribute his pills. CS-3 declined to sell THATCHER's pills because he/she believed that the pills that THATCHER manufactures have resulted in multiple overdose deaths throughout

---

[9] CS-3 was arrested by the DEA in September 2016. The information provided by CS-3 has been independently corroborated by investigators though physical surveillance, records analysis and other investigative means. Investigators have determined that the information provided by CS-3 is reliable and credible. CS-3 has been convicted of two misdemeanors: possession of marijuana (2007) and Criminal Possession of a Controlled Substance 7° (2014). CS-3 provided information to investigators in exchange for prosecutorial consideration on his/her federal charges.

the area. CS-3 identified Morgan Cloke as a person who died after ingesting pills he received from JESUS RIVERA. CS-3 told investigators that RIVERA received the pills from THATCHER. CS-3 stated that THATCHER drives a "G37 Infiniti," which your affiant believes is a 2012 Infiniti G37, bearing New York license plate number GVE-8552 and Vehicle Identification Number (VIN) JN1CV6ARXCM672355, registered to Amber C. Bates of 549 Chambers Road, Horseheads, New York (hereinafter, "the Infiniti").

### SEIZURE OF FURANYL FENTANYL AT JOHN F. KENNEDY AIRPORT

24.     On March 13, 2017, Customs and Border Protection (CBP) at the John F. Kennedy International Airport Mail Branch in Queens, New York, identified and selected United States Postal Service (USPS) package bearing number LT847301597CN for examination as part of an enforcement effort targeting international mail originating in China. The package was addressed to "Carito Rios, 1015 Oak St, Elmira, NY 14901," and the sender was listed as "Digital Partner, Bana 82 Q Huameiju D-618, Shenzhenshi, Guandong." USPS tracking information indicates that the package had been shipped from the sender in China on February 21, 2017, and arrived in New York on February 23, 2017, where it was held until it passed through the United States customs inspection process. Upon examination, the package was found to contain a white crystal-like substance within a foil pouch weighing approximately 249 grams. A presumptive field test utilizing a Fourier-Transform Infrared Spectroscopy (FTIR) device identified the substance as furanyl fentanyl.

25.     New York State Department of Motor Vehicles (DMV) records show that an individual named CARLITO RIOS, JR., is listed as residing at 1015 Oak Street, Apartment A, Elmira, New York. Records checks also reveal a Facebook account belonging to RIOS,

which was identified by comparing photographs posted to that account and RIOS' New York State driver's license photograph. This Facebook account contained photographs of a white BMW 3 series sedan that RIOS represented as his, along with pictures of a subject identified as Valerie Joe, who was represented as RIOS' girlfriend. DMV records show that a white 2007 BMW 328IS, bearing New York license plate number HPK5020, was registered to Valarie Joe on March 13, 2017, at **Target Location 3** – 2063 Chambers Road, Beaver Dams, New York. Members of the investigative team conducted surveillance at **Target Location 3** on April 6, 2017, and April 11, 2017. On both occasions, the investigative team observed a white BMW in the driveway of **Target Location 3**. Based on the similarity between the name of the addressee on the above-referenced seized package and RIOS's name,[10] and the fact that the package was destined for an address associated with RIOS, I believe that RIOS was the intended recipient of the seized package containing 249 grams of furanyl fentanyl.

26.     This investigation has determined that telephone number (607) 302-8298 is used by ROBERT IAN THATCHER. A search for telephone number (607) 302-8298 on www.facebook.com reflects that it is assigned to the Facebook account for ROBERT IAN THATCHER. The Facebook account is listed under "Ian Thatcher" and there are numerous photographs of THATCHER and his significant other, Amber Bates, as well as other information confirming that the account belongs to THATCHER. CARLITO RIOS is listed among the "friends" associated with THATCHER's Facebook account.

27.     Based upon my training and experience, I am aware that it is common for drug traffickers to arrange for packages containing contraband to be delivered to trusted associates

---

[10] RIOS's first name is CARLITO, while the addressee is listed as "CARITO," a difference of one letter.

14

in order to avoid prosecution should the package be intercepted by law enforcement. The recipients of these packages usually receive these packages in exchange for money and/or drugs. Based upon the information revealed during the course of this investigation, I believe that such an arrangement likely exists between THATCHER and RIOS. As detailed in this affidavit, CS-3 identified RIOS as a distributor for the THATCHER Organization.

28.    On May 8, 2017, at approximately 2:00 p.m., physical surveillance was established in the vicinity of CARLITO RIOS, JR.'s place of employment at For Your Entertainment (FYE), a retail store located at the Arnot Mall in Elmira, New York. At that time, your affiant and TFO Allen Wood entered the Arnot Mall just as RIOS was leaving the FYE store. Surveillance was maintained of RIOS as he entered a white-colored 2007 BMW 328IS sedan, bearing New York State license plate number HPK5020 (hereinafter, "RIOS's BMW"). At that time, NYSP Trooper Chris Glick was positioned nearby in a marked NYSP vehicle to initiate a traffic stop of RIOS for unlicensed operation of a vehicle. HSI Special Agent LeRoy Oswald maintained aerial surveillance of RIOS as he departed the vicinity of the Arnot Mall and traveled to his residence located at **Target Location 3**. At approximately 2:20 p.m., aerial surveillance was maintained of RIOS as he arrived at **Target Location 3**. At that time, Special Agent Oswald observed RIOS park the vehicle in the driveway of the residence before observing RIOS exit the driver's side of the vehicle and enter the residence. Aerial surveillance of RIOS was terminated shortly thereafter, while ground surveillance of RIOS was maintained thereafter.

29.    On May 8, 2017, at approximately 4:55 p.m., NYSP Investigator Kevin Backer observed RIOS exit **Target Location 3** and retrieve mail from the roadside USPS mailbox at the end of the driveway. Investigator Backer then observed RIOS enterer the passenger side of RIOS's

15

BMW with the mail, as Valerie Joe exited **Target Location 3** with two adolescent children. Joe got into the driver's seat of the vehicle and the children sat in the rear. Surveillance of RIOS's BMW was maintained as RIOS traveled toward Big Flats, New York. At approximately 5:10 p.m., your affiant observed RIOS's vehicle turn off Chambers Road onto Big Flats Road heading westbound. At approximately 5:14 p.m., your affiant observed RIOS's BMW arrive at **Target Location 1** and park in the driveway. At approximately 5:18 p.m.,[11] your affiant observed RIOS's BMW leave the vicinity of **Target Location 1** and travel eastbound on Big Flats Road.

30.     On May 8, 2017, at approximately 5:20 p.m., NYSP Trooper Chris Glick initiated a traffic stop on RIOS's BMW. At that time, Trooper Glick approached the vehicle and asked the driver, Valerie Joe, for her license and vehicle registration. Trooper Glick explained to Joe that a vehicle similar to the BMW had departed an area gas station without paying for gas. Trooper Glick asked where she was coming from. Joe stated that they were coming from "his friend's house" because RIOS had to use the bathroom. At that time, Trooper Glick asked RIOS for identification and RIOS gave him a New York State identification card. Joe told Trooper Glick that they were traveling to the Wal-Mart located at 1400 County Road 64 (Big Flats Road) in Elmira. Trooper Glick asked why RIOS did not use the restroom at the Wal-Mart and RIOS responded, "*I don't do that there.*" Trooper Glick ended the traffic stop shortly thereafter and physical surveillance was terminated at that time.

31.     Based on my training and experience, and my knowledge of this investigation, I believe that RIOS was likely delivering drugs, drug proceeds or other materials relating to the

---

[11] **Target Location 1** is located at the end of a cul de sac. As a result, your affiant was unable to maintain surveillance of RIOS' activities in the driveway after he arrived and before he departed.

THATCHER Organization to THATCHER when RIOS went to **Target Location 1** on May 8, 2017. This conclusion is based on, among other things, the fact that RIOS was identified by CS-3 as a drug distributor for the THATCHER Organization, that the previously-seized package of furanyl fentanyl was destined for RIOS, that RIOS left **Target Location 3** immediately after the mail arrived, that RIOS then traveled a significant distance from **Target Location 3** to **Target Location 1**, that RIOS stayed at **Target Location 1** for only approximately four minutes, and that the explanation to Trooper Glick for their trip to **Target Location 1** appeared to be false and defied common sense.

### CONTROLLED PURCHASES FROM DWAYNE BANKS

#### CONTROLLED PURCHASE – FEBRUARY 23, 2017

32.    On February 23, 2017, the investigative team utilized CS-2 to conduct a controlled purchase of tablets containing approximately 5.89 grams of furanyl fentanyl[12] in exchange for $900 in cash from DWAYNE BANKS inside **Target Location 2**. Prior to the meeting with BANKS, CS-2 and CS-2's vehicle were searched with negative results for the presence of contraband. The investigative team also equipped CS-2 with a concealed recording device, and gave CS-2 $900 in United States Currency (DEA official funds). The recording of the controlled purchase revealed that the following conversation took place between BANKS and CS-2 at **Target Location 2**:

|  |  |
|---|---|
| BANKS: | *Just give me 6 for this one. That's a huge bag.* |
| CS-2: | *Cool. I'll take it.* |
| BANKS: | *That is more than what I usually.* |
| CS-2: | *Is that all you have? Do you have any more? I'll take it.* |

---

[12] A laboratory analysis conducted by the DEA Northeast Regional Laboratory confirmed that the exhibit contains N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2-carboxamide, which is furanyl fentanyl.

BANKS:      *Nah, I need the other ones because I have other people too.*

CS-2:       *All right, all right. Fair enough .*

BANKS:      *I gave you the good one.*

CS-2:       *Ok, fair enough.  I appreciate it sir. Here's your 9.*

BANKS:      *Thank you.*

CS-2:       *Thank you. Do you think it will be anytime soon?*

BANKS:      *Hopefully any day now.*

CS-2:       *Hopefully. All right, cool let me know.*

BANKS:      *All right.*

CS-2:       *Have a good night.*

BANKS:      *Yo, you haven't heard of nobody overdosing recently, right?*

CS-2:       *No, all I've heard of people overdosing on is dope not these.*

BANKS:      *Ok ok.*

CS-2:       Yeah. *No, no, no.*

33.     During this recorded conversation, BANKS revealed to CS-2 that he was in possession of additional quantities of drugs but that he was unwilling to distribute the drugs to CS-2 because he had obligated the drugs to "*other people,*" meaning customers.  CS-2 later said "*here is your 9,*" which was a reference to the $900 in DEA official funds provided to CS-2 for the controlled purchase.  CS-2 then inquired about the next supply of fentanyl tablets by asking, "*Do you think it will be anytime soon?*" BANKS responded that he expected to receive a new supply of fentanyl tablets soon by saying "*Hopefully any day now.*" Based on my training and experience, I am aware of the lethal properties of controlled substances containing opiates; specifically fentanyl and its analogues. Those who distribute controlled substances often make an effort to distance themselves from drug customers who are associated with overdoses, especially those resulting in death or serious injury, as they may cause increased scrutiny by law enforcement authorities.  I believe that BANKS said "*you haven't heard of*

*nobody overdosing recently right,"* because he is aware that the controlled substances he and his co-conspirators distribute are known to cause overdoses and deaths.

### CONTROLLED PURCHASE – MARCH 4, 2017

34.  On March 4, 2017, the investigative team utilized CS-2 to make a controlled purchase of pill fragments and powder containing approximately 1.265 grams of furanyl fentanyl[13] in exchange for $600 (DEA Official Funds) from DWAYNE BANKS inside **Target Location 2**. Beginning at approximately 7:16 p.m., CS-2, acting under the direction of the investigative team, exchanged the following text messages with BANKS (who was using the telephone assigned number (607) 846-5430):

> CS-2: *You back home? Should be leaving my mom's shortly and I'll be right over*
> CS-2: *I'm gonna hang out here till u answer so just lmk asap*
> CS-2: *?*
> BANKS: *Like 30 mins*
> CS-2: *Okay*
> BANKS: *U got the 600*
> CS-2: *Yeppers*
> BANKS: *With u*
> BANKS: *Kk I'm omw home*
> CS-2: *Ready?*
> BANKS: *15 mins be here*
> BANKS: *I'm in shower lol*
> CS-2: *Okay*

---

[13] A laboratory analysis conducted by the DEA Northeast Regional Laboratory confirmed that the exhibit contains N-(1-phenethylpiperidin-4-yl)-N-phenylfuran-2-carboxamide, which is furanyl fentanyl.

35.    Prior to the meeting with BANKS, CS-2 and CS-2's vehicle were searched with negative results for the presence of contraband. The investigative team equipped CS-2 with a concealed audio transmitter and recording device, and gave CS-2 $600 in United States Currency (DEA official funds). During the controlled purchase, BANKS told CS-2 that he expected to receive more fentanyl pills from his supplier within the next few days.

### DELIVERY OF PILLS – APRIL 3, 2017

36.    On April 3, 2017, your affiant was contacted by an individual associated with CS-2 (hereinafter, "JD"). JD reported that DWAYNE BANKS had unexpectedly provided JD a quantity of blue-colored pills on behalf of CS-2. At that time, I contacted EPD Investigator Daniel VanDine and requested that EPD investigators meet with JD to retrieve the blue-colored pills and obtain a written statement. The blue-colored pills bore markings that are consistent with the marking on other pills purchased from BANKS by CS-2. The investigative team retrieved the pills from JD and took a written statement from JD. In the statement, JD described the meeting with BANKS and stated, "*Dwayne [BANKS] told me there were 180 pills in the bag and said he normally does them for $13.00 a pill*" and that CS-2 "*could just give him an even $2,400.00.*" Your affiant believes that JD accepted the pills from BANKS out of fear that BANKS might become suspicious or cause bodily harm to JD or CS-2 if JD did not accept them. JD also wrote that BANKS had placed the bag containing blue pills in JD's hand and said that CS-2 "*won't care if you take them, right bro?*" A laboratory analysis conducted by the DEA Northeast Regional Laboratory confirmed that the exhibit obtained by JD from BANKS consisted of 184 tablets containing approximately 11.4365 grams of U-47700.

CONTROLLED PURCHASE AND RELATED EVENTS – APRIL 8, 2017 ·

37.     On April 8, 2017, at approximately 3:15 p.m., pole camera surveillance at **Target Location 2** (which is known to be BANKS's residence) showed an individual believed to be DWAYNE BANKS enter the driver's side of a black-colored 2014 Chevrolet Traverse CTV, bearing New York license plate number FCD-8243, which is registered to Alison M. Monroe at 579B Riverside Avenue, Elmira, New York. At the same time, court-authorized geolocation information for the cellular telephone assigned number (607) 846-5430, which is used by BANKS, indicated that the telephone was located at **Target Location 2.**

38.     Pole camera surveillance footage from **Target Location 1** showed that, on April 8, 2017, at approximately 3:48 p.m., a black-colored Chevrolet Traverse CTV with a gold-colored New York license plate, which is believed to be the above-referenced Chevrolet Traverse CTV that BANKS was observed entering at approximately 3:15 p.m. at **Target Location 2**. An individual believed to be BANKS was then recorded approaching the Sayre location. At that time, a white male believed to be ROBERT IAN THATCHER granted BANKS entry to the Sayre location as he retrieved mail from the USPS box affixed to the right of the doorway. The individual identified as THATCHER then re-entered the Sayre location.

39.     On April 8, 2017, at approximately 4:35 p.m., the individuals believed to be THATCHER and BANKS were observed exiting the Sayre location. BANKS entered the driver's side of the black-colored Chevrolet Traverse CTV and left the area, while THATCHER re-entered the Sayre location. At approximately 5:04 p.m., BANKS's black-colored 2014 Chevrolet Traverse CTV, bearing New York license plate number FCD-8243,

arrived at **Target Location 2**. At that time, BANKS was observed exiting the vehicle while holding what appeared to be a white-colored package to his abdomen with his right hand as he approached his residence.

40.    On April 8, 2017, at approximately 7:21 p.m., the investigative team utilized CS-2 to conduct a controlled meeting with BANKS inside **Target Location 2**. During the meeting, CS-2 paid $2,700 (DEA official funds) to BANKS, which represented $300 for the pills received from BANKS on March 4, 2017, and $2,400 for the pills received from BANKS on April 3, 2017. BANKS then distributed a quantity of blue-colored pills to CS-2 on consignment. During the meeting, BANKS said, "*they are just a little weaker than they were. Just give me ten dollars apiece for now on.*" A laboratory analysis conducted by the DEA Northeast Regional Laboratory confirmed that the exhibit obtained by CS-2 from BANKS consisted of 188 tablets containing approximately 11.4418 grams of U-47700.

41.    On April 8, 2017, at approximately 6:32 p.m., through electronic video surveillance from a public location, agents reviewed footage the Sayre location showing an individual believed to be ROBERT IAN THATCHER exiting the Sayre location and then entering a gray-colored Infiniti G37 sedan. Court-authorized geolocation information for the cellular telephone assigned number (607) 302-8298, used by THATCHER, indicated that the telephone traveled from Sayre, Pennsylvania, to Elmira, New York, which is consistent with my belief that THATCHER used the Infiniti sedan to travel from the Sayre location to **Target Location 1**.

## CONTROLLED PURCHASE – APRIL 14, 2017

42.     On April 14, 2017, the investigative team again utilized CS-2 to conduct a controlled purchase from DWAYNE BANKS inside **Target Location 2**. Prior to the meeting with BANKS, CS-2 and CS-2's vehicle were searched with negative results for the presence of contraband. CS-2 was also equipped with a concealed recording device and provided with $2,000 United States Currency (DEA official funds). During the controlled meeting at **Target Location 2**, CS-2 provided $2,000 to BANKS in order to satisfy the debt resulting from the pills previously received from BANKS. BANKS then gave CS-2 approximately 188 tablets on consignment. A laboratory analysis conducted by the DEA Northeast Regional Laboratory confirmed that the exhibit obtained by CS-2 from BANKS contained approximately 11.4371 grams of U-47700.

## CONTROLLED PURCHASE – APRIL 20, 2017

43.     On April 20, 2017, the investigative team again utilized CS-2 to conduct a controlled purchase from DWAYNE BANKS inside **Target Location 2**. Prior to the meeting with BANKS, CS-2 and CS-2's vehicle were searched with negative results for the presence of contraband. CS-2 was also equipped with a concealed recording device and provided with $1,500 United States Currency (DEA official funds). During the controlled meeting at **Target Location 2**, CS-2 provided $1,500 to BANKS in order to satisfy the debt resulting from the pills previously received from BANKS. BANKS then gave CS-2 a quantity of blue-colored pills on consignment. A laboratory analysis conducted by the DEA Northeast Regional Laboratory confirmed that the exhibit obtained by CS-2 from BANKS consisted of 167 pills containing 10.19 grams of U-47700.

## CONTROLLED PURCHASE – MAY 4, 2017

44.     On May 4, 2017, the investigative team again utilized CS-2 to conduct a controlled purchase from DWAYNE BANKS inside **Target Location 2**. Prior to the meeting with BANKS, CS-2 and CS-2's vehicle were searched with negative results for the presence of contraband. CS-2 was also equipped with a concealed recording device and provided with $2,000 United States Currency (DEA official funds). During the controlled meeting at **Target Location 2**, CS-2 provided $2,000 to BANKS in order to satisfy the debt resulting from the pills previously received from BANKS. BANKS then gave CS-2 approximately 11 grams of a blue-colored substance suspected to contain U-4770 or furanyl fentanyl on consignment.

## VEHICLE TRACKING INFORMATION

45.     On April 14, 2017, the Honorable Marian W. Payson, United States Magistrate Judge, Western District of New York, issued an order, under Case Number 17-MJ-4029, authorizing the installation and monitoring of a tracking device on the Infiniti, which is used by ROBERT IAN THATCHER. Pursuant to that order, the investigative team covertly installed and began monitoring the tracking device on April 19, 2017.

46.     Since the tracking device was installed, the investigative team has observed that the Infiniti remains at **Target Location 1** most of the time. Monitoring of the tracking device has also revealed that the Infiniti has made frequent evening trips to the Sayre location (604 South Lehigh Avenue, Sayre, Pennsylvania). A digital remote camera used by the investigative team at the Sayre location shows that, on numerous occasions, THATCHER would arrive at the Sayre location, sometimes alone but often accompanied by

24

MAXIMILLIAN SAMS, enter the residence and remain there for several hours before returning directly to **Target Location 1** later in the evening.  As detailed herein, ANTHONY PRETTYMAN told investigators that THATCHER and SAMS use the Sayre location to store drugs.

47.     Monitoring of the tracking device also shows that the Infiniti travels to area gas stations with high frequency.  For example, on April 25, 2017, at approximately 4:30 p.m., THATCHER's vehicle departed **Target Location 1** and traveled eastbound to an area near Mill Street Ball Park in Horseheads, New York, arriving at approximately 4:39 p.m.  The Infiniti then traveled westbound on Interstate 86 to the Mobil Gas Station at 121 East Front Street in Addison, New York, arriving at 5:08 p.m.  The Infiniti remained at the Mobil Gas Station for less than 4 minutes before returning directly to **Target Location 1**.  It should be noted that the distance between **Target Location 1** and the Mobil Gas Station is more than 27 miles.  At approximately 5:41 p.m., the Infiniti again departed **Target Location 1** and traveled to the Express Gas Station at 607 South Main Street in Horseheads, arriving at approximately 5:50 p.m.  The Infiniti remained at that location for three minutes and then returned to a parking lot south of the Mill Street Ball Park.  The Infiniti remained at the Mill Street Ball Park for approximately 30 minutes and then returned to **Target Location 1**.

48.     Similarly, on May 2, 2017, the Infiniti travelled to the Sunoco Gas Station at 208 West 2nd Street in Elmira, arriving at approximately 11:18 p.m.  The Infiniti then traveled to the Sunoco Gas Station on Chambers Road, arriving at approximately 12:37 p.m.  The vehicle then traveled to the Sunoco Gas Station/McDonald's restaurant on Grand Central Avenue in Horseheads, New York, arriving at approximately 12:54 p.m. before returning to **Target Location 1** thereafter.

49.     Based on my training and experience, your affiant am aware that those who distribute controlled substances often conduct their illegal drug transactions at businesses, such as gas stations, where there is a high volume of vehicular and pedestrian traffic in order to avoid arousing suspicion by law enforcement authorities. Considering the information that has been revealed to me during this investigation, your affiant believes that the travels of the Infiniti and the frequent stops at gas stations revealed by the tracking device are consistent with my belief that THATCHER is engaged in drug trafficking activities.

RECENT POLE CAMERA OBSERVATIONS OF THATCHER AND SAMS AT SAYRE LOCATION

50.     On May 5, 2017, at approximately 11:46 a.m., the video camera at the Sayre location recorded the Infiniti arriving at that location. THATCHER was then observed entering the residence, carrying a black-colored bag over his left shoulder. At approximately 12:17 p.m., a white-colored 2011 Range Rover, bearing New York license plate NOTMOMZZ (which is currently registered to MAXIMILLIAN C. SAMS at 327 West Clinton Street, Elmira, New York (**Target Location 4**)) was observed arriving at the Sayre location. The Range Rover parked behind the Infiniti and then SAMS got out of the vehicle and entered the Sayre location. At approximately 7:45 p.m., SAMS was observed exiting the Sayre location while holding a gray-colored laptop computer in his left hand. SAMS placed the laptop inside the Range Rover and then went back inside the Sayre location. At approximately 10:11 p.m., SAMS was observed exiting the Sayre location, entering the Range Rover, and leaving the area. Physical surveillance of SAMS' Range Rover was maintained as the vehicle traveled westbound on Interstate 86 towards Elmira. At the request of the investigative team, EPD Officer Robert Raymond initiated a traffic stop of SAMS' Range Rover on East 5th Street in Elmira. At that time, Officer Raymond identified the driver of the

vehicle as SAMS. When asked where he was coming from, SAMS told the officer that he was coming from his friend's house in Sayre, Pennsylvania. SAMS said that he was traveling to his residence located at **Target Location 4**.

51.     SAMS provided Officer Raymond with verbal consent to search the vehicle. During the search, Officer Raymond observed that SAMS had a gray-colored laptop computer in the rear of the vehicle behind the driver's seat. Officer Raymond searched the interior of the Range Rover, but did not perform an exhaustive search out of concern that SAMS may become suspicious that he was under investigation. Officer Raymond did not locate weapons or contraband during the search.[14]

52.     On May 9, 2017, at approximately 6:30 p.m., SAMS' Range Rover was observed arriving at the Sayre location and parking directly behind the Infiniti. At that time, an individual believed to be SAMS was observed exiting the driver's side of the vehicle and entering the Sayre location. At approximately 9:27 p.m., an individual believed to be SAMS was observed exiting the Sayre location, re-entering the Range Rover and leaving the area. Moments later, an individual believed to be THATCHER was observed exiting the Sayre location, entering the Infiniti and leaving the area.

---

[14] It should be noted that, in the past, SAMS has been found in possession of a container with a false bottom. Specifically, on February 11, 2016, EPD Patrol Officer Thomas Marsh observed a black Infiniti sedan turn southbound on Euclid Avenue in Elmira without using a turn signal. The black Infiniti, which had Pennsylvania license plate number JZX8073 and was registered to ROBERT IAN THATCHER at 604 South Lehigh Avenue, Sayre, Pennsylvania (the Sayre location). Officer Marsh initiated a traffic stop of the vehicle on Clinton Street in Elmira. The driver, MAXIMILLIAN SAMS, stated that he was traveling to **Target Location 1** in Elmira to meet Amber Bates (THATCHER's significant other). SAMS indicated that Bates usually operates the vehicle but that THATCHER owned the vehicle. After officers smelled an odor of marijuana emanating from the vehicle, a search of the vehicle was conducted. During the search, they recovered a small quantity of suspected marijuana, Chlorox wipes container that had an empty hidden false compartment. In addition, SAMS had approximately $2,000 United States currency in his wallet. When asked about the currency, SAMS stated that he was employed as a *"financial advisor."*

53.     On May 10, 2017, at approximately 5:48 p.m., an EPD digital video camera located in the vicinity of **Target Location 4** showed SAMS exiting **Target Location 4** and entering the driver's side of SAMS' Range Rover.   At approximately 7:11 p.m., the digital video camera at the Sayre location showed SAMS' Range Rover arrive at the Sayre location. At that time, SAMS was observed exiting the driver's side of the vehicle and THATCHER was observed exiting the passenger side of the vehicle.   THATCHER was observed using a key to enter the Sayre location followed by SAMS.   Moments later, THATCHER exited the Sayre location before retrieving what appears to be a tan-colored plastic bag, approximately 15 inches in circumference, from the passenger side of SAMS' Range Rover and re-entering the Sayre location.   At approximately 8:50 p.m., THATCHER and SAMS were recorded exiting the Sayre location before spending several minutes examining the left side of the tailgate of THATCHER's black-colored 2003 Chevrolet Silverado in the dark with a flashlight.   Prior observations of this vehicle have revealed that this vehicle is registered to Amber Bates at 549 Chambers Road, Horseheads, New York (weather conditions prohibited investigators from confirming the plate using the video camera).   At approximately 9:15 p.m., SAMS and THATCHER were observed exiting the Sayre location, re-entering SAMS' Range Rover and leaving the area.   At approximately 10:09 p.m., the EPD camera recorded SAMS' Range Rover arriving at **Target Location 4** and SAMS subsequently entering the residence at that location.

54.     It should be noted that, during the time that the pole camera surveillance has been in place at the Sayre location,[15] the investigative team has not observed anyone at the

---

[15] The pole camera was installed at the Sayre location on or about March 22, 2017, and has been in continuous operation since that time (with the exception of occasional, brief periods where the camera experienced technical issues).

Sayre location other than THATCHER, SAMS, BANKS (on April 8, 2017 only), Amber Bates, and a few unidentified males. With one exception,[16] your affiant has not observed THATCHER spend the night at the Sayre location. Rather, THATCHER is generally observed traveling to the Sayre location (often with SAMS), staying for a period of time, and then leaving and returning to New York. It should also be noted that **Target Location 1** (THATCHER's residence) is more than 27 miles from the Sayre location and that Sayre is a short distance over the New York state line. A review of the records from the tracking device on the Infiniti does not show THATCHER visiting any locations in the Sayre area other than the Sayre location and, occasionally, commercial locations (such as a Subway restaurant). Considering THATCHER's lack of gainful employment, it is highly unusual for THATCHER to be maintaining a second house, more than 27 miles away from his residence in another state. Additionally, your affiant believes that the pattern of THATCHER's activity at the Sayre location corroborates the information provided by ANTHONY PRETTYMAN that THATCHER and SAMS use the Sayre location to store drugs.

### THATCHER'S LACK OF EMPLOYMENT

55.     As part of this investigation, the investigative team has utilized, among other things, information provided by confidential sources, government record checks, toll and pen register records, physical and pole camera surveillance at various locations (including **Target Location 1** and the Sayre location), a mobile tracking device on the Infiniti, and geolocation data from THATCHER's mobile telephone to monitor the daily activities of THATCHER.

---

[16] On one occasion, THATCHER and Amber Bates were observed entering the Sayre location. They did not leave the Sayre location until the following day.

The information gathered through the use of these investigative techniques shows that THATCHER does not have any legitimate employment. In other words, there is no indication that THATCHER regularly reports to any commercial location(s) for the purpose of working.[17]

56.     Additionally, the investigative team has identified two active bank accounts associated with THATCHER – an account in the name of ROBERT I. THATCHER, 604 South Lehigh Avenue, Sayre, Pennsylvania (the Sayre location), at Community Bank; and an account in the name of THATCHER's significant other, Amber Bates, at Chemung Canal Trust Company. Subpoenaed records for the Community Bank account show that, during the time period from February 2016 through February 2017, there were approximately 25 cash deposits totaling approximately $44,820.[18] Subpoenaed records for the Chemung Canal Trust Company account show that Bates – and occasionally THATCHER – makes frequent cash deposits ranging from $50 to $2,000, with the most common deposit amounts being in the hundreds of dollars or approximately $1,000. Notably, there were no direct deposits to either bank account, which provides further support for the conclusion that neither THATCHER nor Bates are gainfully employed.

57.     Considering the large-scale drug manufacturing and trafficking operation described in this affidavit, and the relatively modest volume of cash deposits in the above-referenced bank accounts, your affiant believes that THATCHER possesses and maintains a

---

[17] This confirms the information provided by ANTHONY PRETTYMAN in November 2016 when he told the investigative team that THATCHER does not have legitimate employment.

[18] The deposits ranged from a low of $200 to a high of $7,000.

significant quantity of cash/currency, constituting proceeds of the THATCHER Organization's drug trafficking activities, at **Target Location 1** and/or the Sayre location.

## MAINTENANCE OF EVIDENCE

58.     Based on my training, my experience, my participation in numerous other narcotic investigations, my participation in this investigation, and my discussions with other experienced law enforcement agents and officers, I am aware that that:

a.     Traffickers and manufacturers of controlled substances frequently maintain, at their residence, garage, place of business or inside their vehicles, quantities of controlled substances to maintain their ongoing drug business;

b.     In addition to drugs, traffickers and manufacturers of controlled substances usually keep, at their residence, garage, place of business or inside their vehicles, paraphernalia for the packaging, diluting, cutting, weighing, processing and distributing of controlled substances, including scales, plastic bags, cutting agents and utensils. Based on the information contained in this affidavit, I further believe that the targets of this investigation possess and maintain items used to manufacture controlled substances, including but not limited to mechanical tableting machines/pill presses, parts and accessory components for mechanical tableting machines/pill presses, tablet dies, excipients (such as microcrystalline cellulose), bulking agents, anti-caking agents, fillers and lubricants (such as magnesium stearate);

c.     Traffickers and manufacturers of controlled substances commonly keep firearms in their homes, garages, vehicles, and businesses to protect themselves, their narcotics, and the proceeds from their narcotics sales, and I am aware that many courts, including the Second Circuit United States Court of Appeals, have found that firearms are among the "tools of the trade" in the narcotics business. Based on the information contained in this affidavit, I believe that the targets of this investigation possess and maintain, not only firearms, but also firearms components and magazines;

d.     In addition to firearms, traffickers and manufacturers of controlled substances commonly possess and maintain ammunition, body armor, firearm cleaning kits, scopes, stocks, holsters, and manufacturer's firearm cases on their person, or in their homes, garages, vehicles or businesses. Based on the information contained in this affidavit, I further believe that the targets of this investigation possess and maintain, not only firearms and components, but also bulletproof vests/body armor;

31

e.      Traffickers and manufacturers of controlled substances commonly maintain records, notes, and other papers relating to drug trafficking, some of which may be in code, including but not limited to sales receipts, shipping labels, shipping receipts, shipping boxes, order forms, storage receipts, records, operating manuals, computer records, publications, notes, checks, money orders, and money transfer receipts. The aforementioned records, notes, and other papers are commonly maintained where the drug possessor/trafficker has ready access to them, such as on their person, or in their homes, garages, vehicles or businesses, or even in electronic storage devices, including, but not limited to computers, laptop computers, computer storage media (including discs, flash drives and hard drives), cellular telephones and smartphones. Based on the information contained in this affidavit, I further believe that the targets of this investigation maintain records, including eBay and PayPal records, and Bitcoin records;

f.      Traffickers and manufacturers of controlled substances commonly maintain books or papers that reflect addresses or telephone numbers for their associates or sources of supply and such items may be in code. The above addresses and telephone numbers may also be stored in electronic storage mediums, including but not limited to cellular telephones, , laptop computers, computer storage media (including discs, flash drives and hard drives), cellular telephones and smartphones;

g.      Traffickers and manufacturers of controlled substances commonly take, or cause to be taken, photographs/videos of themselves, their associates, their property, their drugs, or their firearms, and usually maintain these photographs/videos in their residences. The above photographs/videos may also be stored in electronic storage media, including but not limited to cellular telephones, smartphones, digital cameras, tablet computer devices, home computers, and computer storage compact discs;

h.      Traffickers and manufacturers of controlled substances commonly maintain pagers, cellular telephones and other communication devices on their person, in their residences, in their vehicles, and in their businesses, that are utilized to further their drug trafficking activities;

i.      Traffickers and manufacturers of controlled substances commonly keep and utilize personal computers, cellular telephones, and smartphones, to further their drug trafficking activities (*e.g.*, to communicate with co-conspirators, customers, and suppliers; to order quantities of controlled substances from overseas suppliers; and to make payments for quantities of controlled substances purchased from overseas suppliers). The use of personal computers by drug traffickers, as well as by the general public, has increased dramatically during the past several years. During the past two years alone, I have participated in investigations where computers, cellular telephones and/or smartphones were seized and

searched pursuant to court-authorized search warrants that contained digital photographs of bulk cash and the target(s) with drug associates, as well as text messages referencing drug transactions;

j.      Traffickers and manufacturers of controlled substances commonly hide contraband; proceeds of drug sales, including currency, financial instruments, precious metals, jewelry, and other items of value; and records of drug transactions, drug sources, and drug customers in secure locations within their residences, garages, vehicles, safe deposit boxes, businesses and storage areas for ready access and to conceal such items from law enforcement authorities;

k.      Traffickers and manufacturers of controlled substances must maintain, on hand, United States currency in order to maintain and finance their ongoing drug business and the cash proceeds of drug trafficking often contain traces of the narcotics sold or bought by the drug dealers;

l.      When traffickers and manufacturers of controlled substances amass large proceeds from the sale of drugs, they attempt to legitimize these profits by utilizing banks, and their attendant services: securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, and business fronts, among other things;

m.      Traffickers and manufacturers of controlled substances often place assets in names other than their own to avoid detection of those assets by government agencies while continuing to use those assets and exercise dominion and control over them;

n.      Traffickers and manufacturers of controlled substances often seem to live above their means and I am aware that courts have recognized that unexplained wealth is probative evidence of crimes motivated, at least in part, by greed, and in particular, trafficking in controlled substances; and

o.      Drug traffickers and manufacturers utilize U. S. currency (cash) as the method of conducting their illegal activity.

### REQUEST FOR NO-KNOCK AUTHORIZATION AND EARLY ENTRY

59.      I respectfully request that any search warrant for **Target Location 1, Tagrte Location 2, Target Location 3**, and **Target Location 4** authorize the executing agents/officers to secure the premises at 5:00 a.m. and allow the search team to enter those

locations without first knocking and announcing their presence. As detailed in this affidavit,

the substances distributed by the THATCHER Organization – furanyl fentanyl and U-47700

– are profoundly dangerous and easily weaponized. These substances – which can be inhaled

or absorbed through the skin, and are lethal even in the smallest quantities – could be thrown

at the agents/officers by the occupants of the **Target Locations** as the agents/officers enter or

secure the premises, causing severe injury or death to the agents/officers or those within close

proximity.

60.     In addition to the threats posed by the substances expected to be encountered,

I believe that requiring the agents/officers to first knock and announce their presence will

result in the occupants of the premises seeking to destroy drugs and other evidence inside or

to possibly reach for weapons to use against the entry team. As detailed in this affidavit, the

investigative team is aware – based on information from a confidential source – that

THATCHER has firearms, including an AK-47 rifle and a .45 caliber handgun. Moreover,

the eBay records summarized in this affidavit indicate that THATCHER has ordered firearms

components and body armor over the Internet.

61.     The basis of my "No-Knock" request is as follows:

a.     THATCHER, SAMS, RIOS and BANKS have been shown to be illegal
manufacturers and distributors of controlled substances, specifically furanyl fentanyl and U-
47700. These substances are easily and readily disposed of or destroyed. Individuals who
illegally sell controlled substances often attempt to dispose of the controlled substances by
flushing it down the toilet, or sending it down the drain, or even swallowing the drugs.

b.     Illegal drug possessors often attempt to flee and/or destroy, carry away,
or hide their illegal drugs, records, and other evidence upon learning of law enforcement's
intention to question, search, or arrest; and

c.     As previously mentioned, members of the THATCHER Organization
have demonstrated a proclivity towards tactical equipment such as assault weapons,

34

bulletproof vests, thermal imaging cameras and other items that could be used against approaching officers.

62.     Based upon the foregoing, it is respectfully requested that law enforcement not be required to wait until daylight hours, nor be required to knock and announce their presence, because to do so would allow the occupants of the **Target Locations** an opportunity to observe who is coming and potentially flee into an area flush with hiding places, destroy evidence, or worse, arm themselves with weapons or dangerous substances, putting police in a possible ambush or "barricaded subject" situation.

## CONCLUSION

63.     **WHEREFORE**, based upon all of the foregoing, your affiant submits there is probable cause to believe that the items listed in Attachment B, Schedule of Items to be Seized, which is incorporated by reference as if fully set forth herein, are presently concealed and will be found in **Target Location 1, Target Location 2, Target Location 3,** and **Target Location 4,** and that those items are evidence, records, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession of controlled substances and controlled substances analogues, with intent to distribute and distribution of controlled substances and controlled substances analogues), 843(a)(5) (possession of dies and other items used to make counterfeit controlled substances and controlled substances analogues), 843(a)(6) (possession of tableting machine and other materials used to manufacture controlled substances and controlled substances analogues), 846 (attempt and conspiracy to possess with intent to distribute, and to distribute, controlled substances and controlled substances analogues), 960(a)(1) (importation of controlled substances), and 963 (attempt and conspiracy to import controlled substances and controlled substances analogues).

Kevin W. Black
Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me
this 15 day of May, 2017.

HON. MARIAN W. PAYSON
United States Magistrate Judge
Western District of New York